## Commonwealth v. Puretta et al., Appellants (No. 1).

*Criminal law—Arson—Intent—Attempt.*

An attempt, in general, is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of the complete accomplishment of it. In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime, to form one of the natural series of acts which the intent requires for its full execution.

On the trial of an indictment for arson, the evidence tended to show that the accused had placed a barrel containing gasoline standing on one end, with a hole in the end next to the floor, from which a large quantity of its contents had run out and spread over and saturated through the floor into the cellar below. The oil or gasoline spread over the floor saturating sacks of flour and the wall several inches above the floor. Three large wooden uncovered buckets filled with gasoline were placed at different points on the floor, draped with several yards of cut paper running from the top of each bucket to the other with parts of it in the gasoline. Several feet of fuse were hung over the edges of the buckets of gasoline with the one end in the gasoline and the other hanging out over the sides of the buckets, around which were tied bunches of loose unignited matches. Another fuse ran from the top of a set of scales down into a bucket of gasoline or oil standing on the floor beneath. Under such circumstances, the evidence must be presumed to have shown acts done in execution of a purpose sufficiently proximate to justify the trial judge in submitting to the jury, the question of an attempt at arson, and a conviction will be sustained.

Argued April 26, 1920. Appeal, No. 127, April T., 1920, by defendant, from judgment of O. and T. Allegheny County, May Sessions, 1919, No. 87, on verdict of guilty in the case of Commonwealth of Pennsylvania v.

Tony Puretta and Joe Torino. Before PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Affirmed.

Indictment for attempt to commit arson. Before HAYMAKER, J.

The facts are stated in the following opinion of the court below, discharging motions for new trial and in arrest of judgment:

The indictment charges that the defendants, on April 1, 1919:

"Unlawfully and feloniously did then and there maliciously and voluntarily cause and attempt to set fire to, with intent to burn the dwelling house of Sam Santangel, there situate, to the great damage of the said Sam Santangel, contrary to the Act," etc.

No objection was made to the form or substance of the indictment. While the defense called a number of witnesses neither defendant took the stand. They were found guilty as indicted. No part of the building was burned and the only question is: Did the evidence justify a conviction of attempt? At the conclusion of the trial the defense put a point "that under all the evidence the verdict of the jury must be not guilty as to both defendants" which was refused. In the motions in arrest of judgment and for a new trial complaint is made that there was no evidence upon which to base a conviction. While a motion in arrest of judgment is never proper, except where there is some defect in the record, yet if there was no evidence in the case to warrant a conviction we should have affirmed that point and directed a verdict of acquittal. If such were the case it would be our duty now to grant a new trial.

Two questions only were urged on the argument of these motions: One that the evidence on the whole, if believed, did not prove an attempt to commit the offense of arson, and the other that even if the evidence established the commission of an attempt, it did not sufficiently show that the defendants were the perpetrators. Tak-

ing up the questions in the order stated, we are obliged to determine as a matter of law whether the evidence with all inferences reasonably deducible therefrom justified the submission of the case to the jury. We will concede that a fully formed intention to commit a crime, coupled with mere preparation to that end, will not constitute an attempt, for there must be an overt act in pursuance of the intent. It is important to keep in mind the nature of the intent for as Mr. Bishop says, in his 1st Vol. on Criminal Law (8th ed.) Section 760:

"Though in attempt some act must accompany the special intent......the act may be less and proceed less far in proportion as the intent is in enormity greater."

That the evidence in the case at bar shows a wicked and diabolical intent will admit of no dispute, but does it prove an attempt? The same author says, in section 721 (1) of the same work, in speaking of attempt:

"The subject......is alike intricate and important. The reports are full of cases upon it, yet it is but imperfectly understood by the courts." His definition of an attempt is this:

"An attempt is an intent to do a particular thing which the law, either statutory or common, has declared to be a crime, coupled with an act toward the doing, sufficient both in magnitude and in proximity to the fact intended, to be taken cognizance of by the law that does not concern itself with things trivial and small, or, more briefly, an attempt is an intent to do a particular criminal thing, with an act toward it falling short of the thing intended. Same vol., section 728. In 2d Wharton, section 2686 (7th ed.) we find:

"An attempt is a deliberate crime, which is begun, but through circumstances independent of the will of the actor, left unfinished. More strictly it is such an intentional, preliminary, guilty act as will apparently result, in the usual course of natural events, if not hindered by causes outside of the actor's will, in a deliberate crime."

In Com. v. Egan, 190 Pa. 10, at the foot of page 21, it is said:

"An attempt, in general, is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution."

And it is said in Com. v. Flaherty, 25 Pa. Superior Ct. 490:

"To constitute an attempt there must be an intent to do a thing with an overt act, which falls short of the thing intended."

The defense contends that the evidence shows only preparation to commit the crime, from which the intent may be inferred, falling short of the proof of an overt act. In distinguishing between acts showing only preparation, and those amounting to an attempt it was said in Com. v. Egan (supra):

"So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law, or of other's rights, they are within the sphere of an intent and do not amount to attempt."

And in Com. v. Flaherty (supra), we find it said that:

"In many cases it is quite difficult to determine the difference between preparations and attempt to commit crime."

In 1 Bish. Crim. Law, section 763, it is stated that:

"Mere preparation made at a distance from the place where the substantive offense is to be committed, is ordinarily too remote an act to satisfy the law of indictable attempt. Yet it would seem that some preparations for the commission of some crimes may be punishable at the common law and with us they would be called attempts. Acts remotely leading towards the commission of the offense are not to be considered as attempts to commit it, but acts immediately connected with it are."

It is important to keep in mind that the acts of which the prosecution complains were not of a remote character, but were immediately connected with the intended crime of arson, and so much so, that while they were being committed, and from a condition which they created, life and property were in constant peril, which we think distinguishes this case from those in which the acts were remote from the substantive crime intended to be committed. We are of opinion that acts immediately connected with the intended crime, even if they are in their nature preparatory, are of themselves overt acts constituting an attempt, whenever in the very doing of them, life and property are put in imminent peril.

This proposition makes it necessary to state much of the evidence in the case. The building involved was a large three-story frame and brick house, with the storerooms in question, a doctor's office and a clothing store on the first floor, and dwelling apartments on the second and third floors. The building is on the south-east corner of Second avenue and Center street, in the Borough of Pitcairn. Second avenue runs east and west, and Center street runs north and south. The building fronts on Second avenue and extends southerly along the east side of Center street to an alley. As originally constructed there was a door leading into a hall on the ground floor, on the extreme east side of the front of the building, which hallway runs back along the east side of the defendant's storerooms to the foot of the stairs that lead up to the apartments on the floors above. At the time of the commission of the alleged crime this stairway was boarded over and access at that point to the second story was cut off. A door led from that hall into defendant's storeroom, with a lock on it which could be opened only from the inside, or storeroom. The front hall door on Second avenue had an ordinary lock on the inside and a sliding bolt directly over the lock. The apartments on the second and third floors could be reached only by a door on Center street, near the rear

end of the defendant's back storeroom. The cellar
could only be reached by an outside door on Center
street, and another at or near the rear end of the hall
described leading into the building from Second avenue.
The defendants conducted a fruit and grocery store, con-
taining two connecting rooms, that occupied the entire
width of the building on the ground floor, from Second
avenue to about the door, on Center street, that leads to
the apartments. The public entrance or door to the
storeroom was on Second avenue and led into what is
called the front storeroom. Another door led from the
hallway into the store, which we have said could be
opened only from the storeroom side, and a third one
was on the Center avenue side, which was not opened or
used, and against which, on the inside, were piled boxes,
barrels, etc.

The defendants were in their store on the night of
March 31, 1919, waiting on customers, as late as 9:30
or 10 o'clock. Shortly after 2 o'clock a. m. of the next
day several persons residing in the apartments, some of
whom resided directly over the storerooms, discovered
the odor of what, at that time, they believed was leaking
gas. After an examination of a number of gas jets on
the second floor, three men, residing in the apartments,
examined a lighted gas jet on the first floor at the en-
trance to the stairway leading up to the apartments and
near the rear storeroom, and finding nothing wrong
there they went out on the street. The odor was equally
strong on the street, and they broke open the door lead-
ing from Center street into the cellar, to turn off the
gas meters, when they discovered gasoline dripping into
the cellar through the floor of defendant's rear store-
room. When they went out again upon the street they
met the policeman of the borough, and finding the hall-
door on Second avenue and the one from the hall into the
storeroom open they entered the store. From these wit-
nesses, the county fire marshal, county detectives and
others who arrived on the scene later on that morning,

we have the following undisputed situation or condition in and under the defendant's rear storeroom. A barrel containing gasoline was standing on end, with a hole in the end next the floor, from which a larger quantity of its contents had run out, spread over, saturated and leaked through the floor into the cellar below. The oil or gasoline spread over the floor, saturating sacks of flour, and the wall several inches above the floor. Three large wooden uncovered buckets filled with gasoline were placed at different points on the floor, draped with several yards of cut paper of variegated color, such as may sometimes be seen in certain places of business at Christmas time, and which can be seen in exhibit No. 3 festooning the ceiling of that same room, running from the top of each bucket to the other, with parts of it in the gasoline. Several feet of fuse were hung over the edges of the buckets of gasoline with one end in the gasoline and the other hanging out over the sides of the buckets, around which were tied bunches of loose, unignited matches. The buckets, fuse and loose matches were all connected up by the strings of cut paper mentioned.

Another fuse ran from the top of a set of scales down and into a bucket of gasoline or oil standing on the floor underneath.

That spoken of by the witnesses as "fuse" was not strictly such in the sense that it contained combustible matter intended to convey fire rapidly to other combustible material, but was, as described by Mr. Salyards, cotton lamp wicks. A can filled with gasoline and turpentine was found in the same room under some broken boxes, within about five feet from the door leading from the hall into the store, and at the head of the cellar steps was found an iron tub containing four or five gallons of gasoline and turpentine. There was also a wooden bucket in the hall, under the closed stairway, partly filled, from which gasoline was leaking. There was also a can full of gasoline or oil in the back storeroom.

Many boxes of matches were scattered about in many different parts of the store. The floor of the back room was practically covered with paper, old sacks, boxes broken and otherwise, and other combustible material, which was not the condition of that room as late as ten o'clock of the evening before. The second floor, the storerooms, and even the street, were full of the fumes and odor of gasoline, and with it all, we are told that these things were not overt acts, but mere preparation to commit arson, with a probable abandonment of the original design, a proposition to which we cannot subscribe for we are of opinion that they constituted an attempt. In the case of Com. v. McLaughlin et al., 105 Mass. 460, the defendants were convicted of attempt to poison a horse with potatoes filled with bran and croton oil, where the evidence showed that one of the defendants climbed into the stall when he was seized by the watchman, and the others were near by. In Reg. v. Taylor, 1 Fos. & Fin. Rep. 511, the defendant was convicted of attempt to burn, in lighting a match close to a shock of corn, after having made threats to burn up the prosecutor, but blew it out when he found he was being watched, the court saying:

"The act must be one immediately and directly tending to the execution of the principal crime, and committed by the prisoner under such circumstances that he has the power of carrying his intention into execution."

A like conviction was held good in the case of Com. v. Kennedy, 170 Mass. 18, in which the defendant placed "rough on rats" to the underside of a crossbar of a mustache cup, with the expectation that the person drinking therefrom would be poisoned, the court saying:

"But........irrespective of the statute, it is not necessary that the act should be such as inevitably to accomplish the crime by the operation of natural forces, but for some casual and unexpected interference......
Every question of proximity must be determined by its own circumstances, and analogy is too imperfect to give much help."

In McDermott v. The People, 5 Park, Crim. Cases (N. Y.), 102, the defendant was convicted of an attempt to commit arson, where the evidence showed that he had prepared camphene and other combustibles, had them in his room, and solicited another to commit the intended crime.

In Griffin v. State, 26 Ga. 493, the conviction of an attempt to break and enter a storehouse was held good where the evidence showed that the defendant took an impression of the key that unlocked the door for the purpose of making or procuring a false key, with the intent of entering the place and stealing therefrom.

There is another principle to be invoked about which there can be little question, and it is this: If the acts we have recited would have, "in the usual course of natural events, if not hindered by causes outside of the actor's will," resulted in the commission of arson then the crime of attempt is committed.

It has been shown that the fumes from the gasoline had permeated the store, cellar, halls, the dwelling apartments, and was in the street surrounding the building. In the hall leading to the apartment there was a lighted gas jet, doubtless for the accommodation of those ascending the stairway to the apartments, and the fumes had penetrated there. A witness for the defense, Antimary, in testifying to the time when he left the store with the defendants, he was asked:

"Q. Did they turn out the light?

"A. There was one light lit, the middle light on the gas.

"Q. Who turned the light down?

"A. Well, Tonnie turned the light down."

Whether that light was turned out or merely down does not clearly appear, but evidently there was a light burning at the entrance of the building on Center street.

In addition to all these things we have the uncontradicted evidence of the fire marshall that the fuse had been lighted, and the burned or scorched end of one of

472    COMMONWEALTH *v.* PURETTA, Appellant.

them was exhibited to the jury. While there was frequent reference by the witnesses to the different pieces of "fuse" hanging over the buckets of gasoline there was no attempt to show their composition. One of the witnesses called by the prosecution called them cotton lamp wicks. An inspection shows that they contained no combustible material. If they are wicks we know that the fire would travel more slowly and would be longer in reaching the gasoline at the other end than would be the case were they composed of powder or other combustible material. If one end of that wick had been lighted, that would constitute an attempt beyond a question. In the Queen v. Goodman, 22 Up. Can., C. P. 338, a conviction was supported where the defendant saturated a blanket with oil, placed it against a building, and lighted a match which went out before it reached the blanket. Other authorities might be cited to the same effect, but we can reach only one conclusion: that the evidence clearly establishes the crime of attempt to burn, as set out in the indictment. We have examined the two authorities cited by the defense on the law of attempt, but do not think they are decisive. In the case of Stabler v. Com., 95 Pa. 318, the defendant was convicted of an attempt to poison. We see no analogy between that case and the one in hand. In the former the defendant, having a grievance against one Waring, solicited the witness to put poison in Waring's spring, offered him a reward, gave him the poison and directed how it should be used. The witness refused, returned the poison, and later found a package in his pocket which he believed was the one handed him by Stabler. The court held that this was not sufficient proof of an attempt. There is a decided difference between the two cases. In the case against Stabler the probability that the witness would administer the poison was very remote, while in our case the danger was immediate and proximate. The case of Com. v. Peaslee, 177 Mass. 267, is in some respects similar to the one at bar, especially in the preparation to burn, but

there is this very essential difference: in the one cited there was no danger to be apprehended from the preparation alone. There could be no conflagration until some further act was committed by the defendant. It further appeared that the witness testified that the defendant changed his mind and the plan was abandoned. The court, after referring to the rule that preparation was an attempt, said:

"But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor, although there is still a locus penitentiæ in the need of a further exertion of the will to complete the crime. As was observed in a recent case, the degree of proximity held sufficient may vary with circumstances, including among other things, the apprehension which the particular crime is calculated to excite."

It would be difficult to imagine a case that could excite greater apprehension than the situation as it was discovered at 2 o'clock in the morning by the witnesses in this case.

The defense contends that the evidence does not fix the crime on these defendants, even if committed. We believe the evidence justified the submission of that question to the jury.

The defendants were then the lessees in possession of the premises; both were in the store according to the evidence of a witness called by them, as late as 10 o'clock on the evening before, four hours previous to the discovery; the condition of the premises, as found at 2 o'clock in the morning, was not so at 10 o'clock on the same night; no locks had been broken to effect an entrance by others; while it is true that the door from the hall into the store was found open, and likewise the hall door; it is not probable that they were left so, if the defendants left the premises at 10 o'clock under ordinary

circumstances.   That door from the hall into the store could not be opened from the outside.   It is more probable that it was left open by the defendants in their haste to leave the premises after creating a condition that might have been followed at any time by a fire.   The facts of the preparation are not capable of any explanation other than that the person placing the inflammable materials intended to commit arson.   A very considerable time must have been spent in arranging the combustible materials and connecting them up with other inflammable substances.   If all this were done by others, as suggested in the argument, without evidence to support it, it must have been begun soon after the store was closed at 10 o'clock, the time fixed by the defendant's witness, when we consider the situation at 2 o'clock the next morning.   The defense offered no evidence in explanation of the interior condition of the store.   The merchandise and fixtures of the store were insured for $4,000 by a policy dated July 6, 1918, expiring three months after the commission of the offense, and an application had been made about three months before the attempt to burn was committed, for additional insurance of $4,000.   The Commonwealth offered no legal evidence, for reasons we cannot understand, to show the valuation of the contents of the store, without which the evidence of insurance was of little consequence.   If the evidence does not fix the crime upon the defendants it can be only on the hypothesis that the offense was committed by another.   We recognize the rule that in criminal cases, involving circumstantial evidence alone, that evidence must exclude every other hypothesis but that of the guilt of the party charged.   This does not mean that the prosecution must prove the utter impossibility of another committing the crime.   Moral certainty is all the law requires in any case of presumptive proof.   We are of opinion that all the circumstances of conditions, time, place and opportunity, with the utter lack of probability that the offense may have been committed by an-

other concur in pointing out the defendants as the perpetrators of the crime charged in the indictment.

The defense cites the case of Com. v. Byers, 45 Pa. Superior Ct. 37, in support of its claim that the evidence does not fix the offense upon the defendants. There is no comparison between the cases. In the case cited, the proof did not show that the fire was of an incendiary character, or that it may not have been the result of accident. The same may be said of Com v. Bone, 64 Pa. Superior Ct. 44. In People v. Dorneberg, 64 N. Y. Supp. 438, others had equal access to the barn with the defendant, and there was no proof of an incendiary origin. There was no evidence that the defendant was in the vicinity of the fire, nor was there proof that the fire was of an incendiary origin in the case of People v. Johnston, 75 N. Y. Supp. 234. In Chapman v. State, 157 Ind. 300, it was said:

"With respect to the corpus delicti, an empty cigar box with a hole in the top, smoke and grease marked, as if at some time it had served to hold a burning candle, found lying on the ground under the edge of a frame house, is the sum total of the evidence upon which the attempted arson rests."

There is no similarity in the cases. The case of State v. Scott, 177 Mo. 665, enunciates the general law relating to convictions on circumstantial evidence, but there was no evidence that the offense was committed by the defendants. The same may be said of the case of State v. Mormey, 196 Mo. 43. We have examined all the cases cited in the brief of defendant's counsel, but find none that is decisive of the case at bar. We are not greatly impressed by the theory advanced by the defense that there may have been an abandonment of the intent even after the preparations, especially when we consider the peril in which the residents were placed and allowed to remain until rescued by others. We believe the case was one for the jury, and therefore both motions are overruled and refused.

To which action of the court the defendants except. Exceptions allowed and bill sealed.

*Errors assigned* were refusal of defendant's motions for new trial and in arrest of judgment.

*A. L. Cramer,* for appellant.—There was no legal evidence to connect the defendants with the offense charged: Stabler v. Com., 95 Pa. 318; Com. v. Byers, 45 Pa. Superior Ct. 37; Com. v. Bone, 64 Pa. Superior Ct. 44; Shepherd v. People, 19 N. Y. 537; Chapman v. State, 157 Ind. 300; State v. Scott, 177 Mo. 665.

*Harry A. Estep,* Assistant District Attorney, and with him *Harry H. Rowand,* District Attorney, for appellee.

OPINION BY HEAD, J., July 14, 1920:

The defendants were indicted for and convicted of an attempt to commit arson. The defense advanced embraced two separate branches, to wit: 1. The evidence as a whole discloses nothing more at the most than a naked isolated intent to burn and was not sufficient to support a conviction of an attempt to burn. 2. The evidence as a whole was insufficient to support the conclusion that the defendants or either of them could be identified as the guilty party or parties.

1. The opinion filed by the learned court below, which will be printed with the record of the case, points out, in a manner satisfactory to us, the reasons why the evidence in this record fully measures up to recognized standards as to its sufficiency to support the conclusion that the intent which was so manifest had ripened into an actual attempt to burn the property. The authorities are collated and carefully reviewed and leave nothing of value for this court to add on that phase of the case.

2. The same opinion fully and carefully reviews the evidence on the part of the Commonwealth and summarizes its salient points as briefly as we could hope to do.

In addition to the facts stated in that opinion it is of interest to observe that the testimony of one of the witnesses produced by the defendant, who went down into the cellar, just as the store was being closed for the night, excludes the possible hypothesis that a stranger might have slipped into the cellar before the closing of the store and concealed himself there until a favorable time had arrived to begin the elaborate preparations that were made to bring about the object intended. It is worthy of note also that the defendants themselves declined to take the witness stand, as they had a perfect right to do, and to offer to the jury any suggestion or explanation that might have helped them to a conclusion that some third person had done the work which could have been so easily done by the defendants but which would have been attended with almost insurmountable difficulties if done by a stranger. The counsel of course were prohibited from commenting on this fact adversely to the jury but it cannot be supposed that tribunal remained oblivious of the fact of their silence any more than that this court should pass it by when considering the application of the defendants to be discharged without day, notwithstanding the verdict of the jury.

Human judgments of course are not infallible, but if human experience and human reason may still be relied on to guide us to conclusions based upon evidence, we must find ourselves, as the learned judge below found himself, unable to say that the evidence left nothing for consideration by the jury and that the defendants were entitled, under the law, to an order discharging them without day.

We have carefully studied the entire record including all of the evidence and we have reached the conclusion that the case was tried in a manner as favorable to the defendants as they had any right to expect and that questions of evidence were ruled upon almost uniformly to their advantage when the Commonwealth might have

reasonably argued that their objections should have been overruled.

The judgment is affirmed and the record remitted to the court below and it is ordered that the defendant appear in that court at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.